UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BRENDA J. INFANTINO, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:21-cv-12058-ADB |
| LLOYD J. AUSTIN III, | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

  Brenda J. Infantino, ("Infantino" or "Plaintiff") filed this action against Lloyd J. Austin III ("Defendant") in his capacity as the Secretary of Defense, alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination Act of 1967 ("ADEA"), and Section 501 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). [ECF No. 1 ("Complaint" or "Compl.") at 1]. Before the Court is Defendant's motion for summary judgment. [ECF No. 64]. For the reasons set forth below, Defendant's motion is GRANTED.

## I.    BACKGROUND

### A.    Factual Background

Except as otherwise noted, the following facts are either not in dispute or stated in the

light most favorable to Plaintiff, the non-movant.  Cochran v. Quest Software, Inc., 328 F.3d 1, 6

(1st Cir. 2003).[1]

#### 1.    August 20, 2017: Plaintiff Commences Her Employment at the Defense Contract Audit Agency

On August 20, 2017, Plaintiff began her employment as an auditor at the Defense

Contract Audit Agency ("DCAA"), a federal agency that "provides financial and audit services

for entities that acquire and administer contracts."[2] [3] [SOF ¶¶ 1, 6, 7].  Plaintiff's job title was

---

[1] The Court draws the facts, unless otherwise stated, from the parties' combined Rule 56.1 statement of material facts, which is Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, [ECF No. 93-1 ("SOF")], and documents referenced therein.  The Court refers to each "Statement" and "Response" as a combined paragraph number.

[2] The Court discerns no material difference between the parties' description of the DCAA.  See [SOF ¶ 1].

[3] The parties dispute whether Plaintiff was required to complete a two-year probationary period. [SOF ¶ 1].  Plaintiff's employment offer email, dated May 10, 2017, stated that she would be "required to complete a two-year probationary period[,]" [ECF No. 63-3 at 2], but the "Notification of Personnel Action," dated August 18, 2017, provided that the "[i]nitial probationary period [had been] completed."  [ECF No. 93-3, Ex. 1].  A year later, on approximately August 15, 2018, Plaintiff asserts that a two-year probationary requirement "suddenly appeared" in her personnel record.  [ECF No. 63-30 at 4, 16].  Plaintiff believes that she did not have to complete a probationary period because she had transferred to the DCAA from another federal agency.  [Id.]  In an email to the human resources specialist Beverly Harris dated October 22, 2018, Plaintiff appears to cite to the DCAA policy, providing:

> [c]urrent Federal employees who transfer to DCAA from other Federal agencies without a break in service and completed their initial probationary period at the prior Agency are normally not required to complete a new or supplemental probationary period. Supervisors should consult with their services [sic] Human

Auditor, GS-511-07.  [Id. at ¶¶ 4, 6, 50].  During her employment at the DCAA, Plaintiff's "first line supervisor" was Jaclyn Parziale ("Parziale").  [Id. ¶ 7].

## 2. Plaintiff's Job Performance: January–August 2018

Sometime in early January 2018, Parziale evaluated Plaintiff's performance in a document captioned "Probationary Period/Trial Evaluation Report."  [SOF at ¶ 10]; see also [ECF No. 63-5 at 3].  Parziale rated Plaintiff as "Fully Successful or Higher" in every performance element.  [ECF No. 63-5 at 2].  Seemingly on May 30, 2018, Parziale issued another performance evaluation, wherein Plaintiff was again rated as "Fully Successful."  [SOF ¶ 17; ECF No. 63-7 at 2–8].  That said, the performance review also stated that Plaintiff "struggled with implementing supervisory guidance in a timely manner."[4]  [ECF No. 63-7 at 4].  A few

---

> Resources Specialist to determinate probationary periods for employees with previous Federal service.

[ECF No. 63-26 at 4–5 (emphasis added)].

The record further indicates that on June 21, 2018, a few months prior to Plaintiff noticing a change in relation to her probationary status, an Employee Relations Specialist at the DCAA, Alfrida Coombs, began exchanging emails with other human resources employees regarding Plaintiff's performance issues and inquired about her "transfer SF-50 documents" showing that she had completed her probationary period.  [ECF No. 93-3 at 12–13].  Specifically, Coombs wrote that this was likely an error given the "nature of [Plaintiff's] former position as a Correspondence Examination technician, and the nature of the position [Plaintiff] was hired for" at the DCAA, but that she did not "want to speculate."  [Id. at 13].  On June 27, 2018, another HR specialist confirmed that Plaintiff's personal record would be adjusted "to reflect [the] probationary period requirement."  [Id. at 12].  In her declaration, Coombs also stated that the department in charge of processing personnel actions informed the DCAA that they had "made a mistake when processing the action."  [ECF No. 63-2 at 7].  Such a mistake, Coombs continued, "is not unusual when transferring an employee from another federal agency."  [Id.].

[4] In full, the portion of the evaluation entitled "Performance Element Narrative" provided that:

> In A/N 2801-20l7Gl0320001, with specific instructions from the supervisor, Brenda assisted the lead auditor on the MAAR 13 and

weeks earlier, in April 2018, Parziale had also voiced concerns to Resident Auditor Jill

DeCourcy ("DeCourcy"), Plaintiff's second level supervisor, [ECF No. 63-6 at 2], about

Plaintiff's timeliness in completing tasks, [id. at 7].  DeCourcy advised Parziale to document her

concerns in Plaintiff's performance evaluation.[5]  [Id. at 7].

---

> verified materials existed. Brenda then completed parts of the
> attribute testing and, with specific instructions from the supervisor,
> she successfully prepared working papers which were in
> accordance with Agency guidance. Brenda appropriate [sic]
> utilized APPS when completing her working papers and
> imported/exported working papers through the Agency provided
> software. With specific instructions from the supervisor, Brenda
> worked towards managing her time and prioritizing audit task [sic].
> This is a skill that I would like to work on in the next rating period
> as Brenda struggled with implementing supervisory guidance in a
> timely manner. With specific instructions from the supervisor,
> Brenda successfully completed tasks assigned to her by the
> supervisory auditor. Brenda kept the supervisor informed of issues
> that arose. Brenda made good observations in this assignment. For
> example, she noted on one PO the line items did not add up to the
> quantity included on the electronic PO. Her attention to detail is
> much appreciated. Brenda also successfully performed third party
> verifications. This is something we had not done in the past but
> Brenda took the task head on and was able to complete it so that
> we could establish reliance on the company's Electronic Receipts
> System (ERS).

[ECF No. 63-7 at 4].

[5] In her declaration, DeCourcy stated that through March 2018, Plaintiff "was fully successful."
[ECF No. 63-6 at 8].  DeCourcy expressed that she believed "the work reviewed during the
period before March 31, 2018, included a lot of hand-holding" and that she was not certain "who
really did the work."  [Id.]  Further, DeCourcy asserted that by April 2018, Parziale "was having
a lot of issues with [Plaintiff's] working papers" and that "[i]t took a lot of back and forth, more
than it should, even for a trainee."  [Id.]

On or around June 4, 2018, Parziale and Plaintiff began having weekly meetings with Stephen Duquet ("Duquet"),[6] [ECF No. 63-1 at 3–4; SOF ¶ 22], who had been assigned as Plaintiff's coach approximately one month after she was first hired,[7] [ECF No. 63-4 at 2; SOF ¶¶ 7, 8].  During these meetings, Plaintiff, Parziale and Duquet "discussed the assignments and reviewed the areas that needed improvement."[8] [9] [SOF ¶ 23].

In July 2018, Plaintiff received a 10-month probationary/trial period evaluation performance report.  [ECF No. 63-13].  Specifically, Parziale wrote that:

> [Plaintiff's] current performance is unsatisfactory.  However, I recommend continued employment at this time in order to give her the opportunity to improve her performance.

_____

[6] Although Plaintiff seemingly disputes when the weekly meetings began, the exhibits cited by Plaintiff, [ECF Nos. 63-1, 63-13], do not contradict Parziale's assertion.  See [SOF ¶ 22].

[7] The Court understands that new employees are assigned a coach by their first line supervisor. [ECF No. 63-1 at 22].  The parties contest when Duquet ceased to be Plaintiff's coach.  Compare [ECF Nos. 63-4 at 2, 63-1 at 3 (Parziale and Duquet maintaining that Duquet acted as Plaintiff's coach from September 20, 2017, through August 2018)], with [SOF ¶ 61 (Plaintiff indicating that Duquet stopped being her coach in January 2018)].  The parties further dispute how long a new hire is entitled to a coach.  While Plaintiff suggests that DCAA policy requires a three-year coaching period for new hires, [SOF ¶ 61], Duquet, Parziale, DeCourcy's declarations indicate that a new hire generally receives coaching anytime between three to twelve months, see [ECF Nos. 63-4 at 2, 8; 63-1 at 2; 63-6 at 3].  Setting aside the parties' dispute, the Court notes that the record reflects that Duquet provided feedback on Plaintiff's work assignments at least on two occasions after January 2018.  See [ECF Nos. 63-12 (email dated July 11, 2018, from Duquet to Plaintiff reflecting that Duquet was providing guidance to Plaintiff on an audit she was working on), 63-16 (email dated August 9, 2018, regarding a conversation between Duquet and Plaintiff wherein she asks for feedback)].

[8] Although Plaintiff contests the accuracy of this statement, she offers no evidence putting Defendant's assertion in dispute.  See [SOF ¶ 23].

[9] The parties dispute Plaintiff's attitude during these meetings.  Plaintiff claims that where Defendant has described her as hostile, "glaring", rolling her eyes, being argumentative or unresponsive to feedback, [SOF ¶¶ 24–27], she was in fact behaving professionally, but being perceived as hostile due to her difficulty hearing, [SOF ¶ 24; ECF No. 93-2 ¶ 13].

Audit Performance: Brenda struggled with implementing supervisory guidance and completing the tasks in a timely manner and did not leave sufficient time for management review and feedback.  Brenda also struggled with implementing basic concepts, such as ensuring the on page note sufficiently described the work performed.

Documenting and Reporting: Brenda struggled with including sufficient information in the working papers to adequately document the work performed and conclusions reached to ensure the working papers are compliant with the GAGAS requirements.

Internal Communication and Support: Brenda continues to struggle with demonstrating an attitude of cooperation when responding to management requests.  Since the progress review discussion on July 3, 2018 Brenda has been less argumentative.  We have started meeting regularly to discuss individual steps in order to break down the audit into smaller tasks. Brenda however does not initiate questions to the SA on tasks assigned or feedback provided[.] Brenda should initiate discussions with the supervisory auditor if there are questions regarding the working papers to help ensure supervisory guidance is implemented in a timely manner.

Ability to Follow Instructions: Brenda continues to struggle with implementing detailed supervisory guidance in a timely manner.

Use of Time: Brenda needs to work on improving completing tasks in a timely manner.

Judgment: Brenda needs to work on improving her knowledge of Government regulations in order to build her skills in recognizing problems and making sound decisions.

Personal Characteristics: Brenda struggles with effectively communicating with the supervisory auditor.  While she is less argumentative she is hesitant to initiate discussions with supervisory auditor if questions arise which ultimately results in tasks not being completed in a timely manner.

[Id. at 3].

Plaintiff received an "Unacceptable" rating in "Audit Performance," "Documenting and

Reporting Results," and "Internal Communication and Support."  [ECF No. 63-13 at 2].  That

said, Parziale nonetheless appraised Plaintiff as "Fully Successful or Higher" in the areas of

"Audit Planning and Approach" and "Communicating and Working with External Contacts."
[Id. at 2].  In a section entitled "Conduct and General Character Traits," Parziale rated "Ability to
Follow Instructions" and "Personal Characteristics" as "Unsatisfactory," and "Use of Time" and
"Judgment" as "Needs improvement."  [Id. at 1].

On August 14, 2018, Plaintiff received an "out of cycle appraisal." [10]  [ECF No. 63-17;
SOF ¶ 48].  As to the area of "Audit Planning and Approach," Parziale described how Plaintiff
struggled with "effectively communicating to the supervisory auditor changes to the budgeted
hours and due date."  [ECF No. 63-17 at 3].  Plaintiff explained that she did not know the
requested timeframe for completing the task, given that this was her first audit.  [Id.].  With
regard to Plaintiff's "Audit Performance," Parziale also noted that Plaintiff "struggled with
implementing supervisory guidance and completing tasks in a timely manner."  [Id. at 4].
Plaintiff responded that during her previous appraisal, she had been considered "Fully
Successful" in this area and appeared to attribute the change in performance evaluation to "a
major communication issue."  [Id.].  For "Documenting and Reporting Results," Parziale
similarly observed that Plaintiff was "performing less than fully successful."  [Id. at 5].

_____

[10] Even though Plaintiff disputes that Parziale completed the evaluation, [SOF ¶ 40], the
appraisal states that the rating official/supervisor was Parziale.  [ECF No. 63-17 at 2].  For some
reason, the first seven pages of the appraisal do not contain marked element ratings which allow
a supervisor to rank an employee as "Outstanding," "Fully Successful," "Unacceptable," or "Not
Rated," but only provide an evaluation in narrative form.  See generally [ECF No. 63-17].  Pages
8–13, which contain marked element ratings, do not include optional reflections by Plaintiff
under "employee input."  [Id. at 8–13].  Seemingly because of this inconsistency, Plaintiff
believes, but without citing to any evidence, that the out-of-cycle appraisal was a "combination
of more than one appraisal."  [SOF ¶¶ 40–44].  The Court observes that the element ratings on
pages 8–13 indicate that Plaintiff was fully successful in the areas of "Audit Planning and
Approach" and "Communicating and Working with External Contacts," [ECF No. 63-17 at 8,
11], consistent with the 10-month probationary/trial period evaluation performance report, [ECF
No. 63-13 at 2].

Specifically, Parziale explained that Plaintiff "lack[ed] the knowledge of basic concepts on what is an appropriate level of detail" and "struggled with including sufficient information in the working papers to adequately document the work performed and conclusions reached." [Id.]. Plaintiff's input on this issue included how she was "confused and frustrated" because she felt that Parziale "was not listening to [her] and reacted defensively when [she] tried to seek guidance from her." [Id.].

On August 16, 2018, DeCourcy informed Plaintiff that since her performance "was rated unsatisfactory" she would not be eligible for a promotion or salary increase. [ECF No. 63-35 at 3].

### B.      July and August 2018: Plaintiff and Parziale's Communication Issues

On August 16, 2018, Plaintiff conveyed to Robert Landry, the Deputy Corporate Audit Director, that she had "a communication issue" with Parziale.[11] [ECF No. 63-21 at 4–5]. Specifically, Plaintiff wrote that she had requested a transfer in supervisor but was told that she was too new for such a request to be granted. [Id. at 4]; see also [ECF No. 63-1 at 35]. Plaintiff also shared her latest performance evaluations with Landry, where she was deemed less than fully successful, and indicated that she felt the appraisals were unbalanced given her prior positive assessments. [ECF No. 63-21 at 4–5]. Plaintiff further expressed her desire to "make this work," but that she believed Parziale and her were "not compatible." [Id. at 5]. On August 27, 2018, Landry assured Plaintiff that he was "looking into [her] concerns" so that he could "understand what ha[d] transpired," [id. at 2], and then, on September 5, 2018, Landry informed Plaintiff that he was meeting with Parziale and DeCourcy "concerning [the] issues [Plaintiff]

---

[11] The record indicates that Plaintiff had articulated difficulties in adjusting to Parziale's communication style as early as July 2018. See, e.g., [ECF Nos. 63-12 at 1–2, 63-6 at 5].

ha[d] brought to [his] attention." [Id. at 1; see ECF No. 63-22 at 5]. In his declaration, Landry noted that during the meeting with Parziale and DeCourcy, they discussed Plaintiff's "performance issues, conduct, and interpersonal communication traits," concluding that they would continue to monitor her performance and "provide her feedback." [ECF No. 63-22 at 5–6]. Plaintiff asserts that Landry "never got back to [her] with the results of said meeting." [SOF ¶ 71].

### C.    Plaintiff's Reasonable Accommodation ("RA") Request

Although the parties dispute when Plaintiff initially made Parziale aware of her hearing impairment, [SOF ¶¶ 64–67], the record shows that on May 21, 2018, Plaintiff emailed Debbie Cruz ("Cruz"), the AEP Compliance Branch Chief, to inquire about the steps to obtain a reasonable accommodation, [ECF Nos. 93-2 at 1, 63-28 at 6]. Plaintiff claims that she sent this email because Parziale instructed her to do so after Plaintiff asked to change desks due to her hearing aids. [ECF Nos. 93-2 at 1, 63-28 at 3–4]. Construing the facts in the light most favorable to the non-movant, the Court will infer that the first time Plaintiff informed Parziale about a disability or medical condition requiring a reasonable accommodation was May 21, 2018.[12]

On June 4, 2018, Cruz provided Plaintiff with forms to submit for her RA Request and referred her to the RA Manager Patricia Obey ("Obey") to complete the process. [ECF No. 63-28 at 4–5].

In a separate request, on August 28, 2018, Plaintiff asked to move desks to avoid "the loud background noise where [she was] currently sitting," emailing Parziale, Cruz, and Obey

---

[12] Plaintiff requests the court to infer that she would not have sent the cited email requesting an accommodation had Parziale not directed her to do so on this date. [ECF No. 93-2 at 1].

with an RA Request.[13]  [ECF Nos. 65 at 4, 63-27].  Parziale replied to Plaintiff on August 30

stating, "[n]o problem you can select any open desk, including your original."  [ECF Nos. 65 at

4; 63-27].

Also on August 28, 2018, Plaintiff emailed Cruz and Obey to reiterate that she was

"requesting a desk location change due to [her] hearing aids picking up more background noise

at [her] current location," and to ask follow-up questions about the RA Request process.  [ECF

No. 63-28 at 3–4].

On September 4, 2018, Plaintiff seemingly had a meeting with Obey and Cruz regarding

her request.  See [ECF No. 63-28 at 2].  Plaintiff and Cruz exchanged emails on September 5 and

14, 2018, clarifying the information necessary to complete Plaintiff's RA Request, including that

Plaintiff could request "rate of speech" as part of her accommodation. [Id. at 1–3].  On September

14, Plaintiff wrote:

> I did move my desk to one where the ventilation noise level is a bit
> lower, but it is still too loud resulting in not clearly hearing other
> people and affecting my concentration.  I also find I am constantly
> asking my supervisor to speak slower since I got my hearing aids
> and I do not know how to resolve that, but it does appear to be a
> factor in communication issues her and I have been having.

[Id. at 1].

A doctor's note dated September 17, 2018, stated that Plaintiff had been diagnosed with

tinnitus and hearing loss in both ears.  [ECF No. 63-33 at 1].  Specifically, the note provided that

Plaintiff had "recently obtained hearing aids which she will most likely need for the duration of

her life."  [Id.].  As to limitations concerning "essential job functions," the note explained that

---

[13] Although Plaintiff had asked to change desks "several times" prior to August 28, 2018, [SOF
¶ 64], Parziale asserts that she was not made aware of Plaintiff's hearing impairment or that the
requests were prompted by a medical condition until August.  [ECF No. 63-1 at 3, 5].

Plaintiff had "difficulty hearing when there is background noise and/or [when] people do not speak clear[ly] or concise[ly]." [Id.]. As a result, Plaintiff "may not hear any directive or conversation necessary to effectively perform her job." [Id.]. Among other things, the note recommended that when speaking with Plaintiff, one must do so "at an understandable rate of speech, such as reading to other [sic] or public speaking, so she may comprehend that what is being said" and be "clear, concise and face her when speaking with her so she may hear you better and read your lips, if need be." [Id. at 2].

  **D.  Termination**

  On September 28, 2018, Plaintiff received a "Notice of Proposed Removal." [ECF No. 63-34 ("Removal Notice")]. Although Plaintiff disputes its accuracy, [SOF ¶ 79], the Removal Notice listed "deficiencies noted since April 1, 2018," including failure to (i) "complete assigned tasks by the approved due date"; (ii) "retain information previously provided"; (iii) "prepare working papers that are properly indexed, referenced, and adequately document the work performed and conclusions reached"; and (iv) "to demonstrate an attitude of cooperation in responding to management requests," [Removal Notice at 1–3]. The Removal Notice further described instances where Plaintiff became "very defensive and argumentative" when her supervisor reviewed audit tasks with her. [Id. at 3–4]. Overall, the Removal Notice provided that Plaintiff had not "demonstrated the attributes of successful performance for a GS-7 auditor. Rather, [Plaintiff] ha[d] failed to follow detailed instructions provided to [her] on a daily basis, . . . failed to use [her] time efficiently, and . . . [had] been defensive and argumentative regarding [her] assignments." [Id. at 4].

  On October 12, 2018, Plaintiff responded to the Removal Notice and submitted 400 documents in support of her continued employment at the DCAA, including that Plaintiff had

received generally positive appraisals until May 2018.  [SOF ¶ 80; ECF No. 63-35]; see [ECF No. 63-36 at 1].  Plaintiff further stated that Parziale did not adequately communicate how she should improve her performance and omitted "positive contributions" Plaintiff had made.[14] [ECF No. 63-35 at 2–3].  On November 26, 2018, Plaintiff received a "Notice of Decision of Removal for Unacceptable Performance," informing her that her employment with the DCAA would be terminated.  [ECF No. 63-36].

### E.      Procedural History

Plaintiff filed the instant action on December 15, 2021.  [ECF No. 1].  On September 28, 2023, following a period of discovery, Defendant moved for summary judgment.  [ECF No. 64]. Plaintiff opposed on July 9, 2024, [ECF No. 93], and Defendant filed a reply on July 26, 2024. [ECF No. 95].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id.  When reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Id.  The First Circuit has noted that this standard "is favorable

---

[14] Although Plaintiff disputes the effectiveness of the instructions provided by Parziale and the extent to which they constitute supervisory guidance, see, e.g., [SOF ¶¶ 28, 30, 37], the record nonetheless reflects that Parziale provided written instructions on various assignments between June and August 2018, [ECF Nos. 63-9, 63-10, 63-11, 63-14].

12

to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must" point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (alteration in original) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).  Importantly, "[e]vidence that is 'conjectural or problematic' will not suffice to forestall summary judgment." Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).

Additionally, Courts "are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, [courts] hold pro se pleadings to less

13

demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." <u>Dutil v. Murphy</u>, 550 F.3d 154, 158 (1st Cir. 2008) (citations omitted).  Nonetheless, "self-representation is not a license not to comply with relevant rules of procedural and substantive law." <u>Andrews v. Bechtel Power Corp.</u>, 780 F.2d 124, 140 (1st Cir. 1985) (internal quotations and citation omitted). "Thus, the Court will consider a pro se movant's circumstances when reviewing his motion for summary judgment but will not provide 'extra procedural swaddling.'" <u>Grossman v. Martin</u>, 566 F. Supp. 3d 136, 143 (D.R.I. 2021) (quoting <u>Eagle Eye Fishing Corp. v. U.S. Dep't of Com.</u>, 20 F.3d 503, 506 (1st Cir. 1994)).  In the exercise of its discretion, and in light of Infantino's pro se status, the Court will consider any factual disputes specifically raised by Infantino and/or the summary judgment record.  If undisputed, the facts stated in Defendant's statements of material facts are deemed admitted, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

## III.   DISCUSSION

Plaintiff here brings claims for sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. (the "ADEA"), and disability discrimination in violation of Section 501 of the Rehabilitation Act of 1973 ("Rehabilitation Act").  [Compl. at 3].  Plaintiff also alleges that Defendant subjected her to a hostile work environment on account of her gender, age, and disability.  [<u>Id.</u> at 6–9; ECF No. 93-2 ¶¶ 12, 24(j)].

### A.        Title VII, ADEA, and Rehabilitation Act Discrimination Claims

The Court interprets Plaintiff's Complaint as alleging that she was discriminated against on the basis of her gender, age, and disability when the federal agency (1) did not promote her in August 2018,[15] [Compl. at 9], and (2) terminated her employment in November 2018, [id. at 7].

In the absence of direct evidence of discrimination, as is the case here, discrimination claims under the three statutes are analyzed under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 221–23 (1st Cir. 2007) (applying burden-shifting framework to Title VII claims of discrimination); Greenberg v. Union Camp Corp., 48 F.3d 22, 26–27 (1st Cir. 1995) (same as to the ADEA); King v. McDonough, 596 F. Supp. 3d 206, 219–20 (D. Mass. 2022) (same as to disability-based discrimination under the Rehabilitation Act).

Pursuant to that framework:

> First, the plaintiff must make out a prima facie case of discrimination.  The burden then shifts to the defendant to present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision.  Finally, the burden is placed on the plaintiff to demonstrate that the non-discriminatory reason is mere pretext and that the real reason was discrimination.

Quinones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802).  "The burden of persuasion remains at all times with the plaintiff."  Mariani-Colón, 511 F.3d at 221.

---

[15] The Court construes Defendant's purported failure to increase Plaintiff's salary as part of the refusal to promote.  [ECF No. 93-2 ¶ 21].

Defendant argues that Plaintiff cannot make out a prima facie case because she cannot show that she performed her job at a satisfactory level. [ECF No. 65 at 9]. Plaintiff replies that her prior positive performance evaluations indicate that "she could perform the essential elements" of her job, and that she has therefore made a prima facie showing of discrimination. [ECF No. 93-2 ¶ 3]. Defendant further contends that, even assuming that Plaintiff can establish a prima facie case, she has proffered no evidence that she was denied a promotion or was terminated as a pretext for unlawful discrimination. [ECF No. 65 at 11].

### 1. Prima Facie Case

#### i. Title VII

Under Title VII, Plaintiff must "establish a prima facie case by showing that (1) she is 'a member of a protected class'; (2) she is 'qualified' for the job . . . ; (3) she has 'suffer[ed] an adverse employment action at the hands of her employer'; and (4) there is 'some evidence of a causal connection between her membership in a protected class and the adverse employment action.'" Stratton v. Bentley Univ., No. 22-cv-01061, 2024 WL 3823034, at *5 (1st Cir. Aug. 15, 2024) (alteration in original) (quoting Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019) (quoting Bhatti v. Trustees of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011))).

##### a. Membership in Protected Class & Job Qualification

As an initial manner, Plaintiff, who is female, plainly qualifies as a member of a protected class on the basis of her sex under Title VII. See generally [Compl.]. With regard to the second prong—that is, whether Plaintiff was qualified for her job—Defendant argues that Plaintiff's performance evaluations sufficiently show that she did not perform her job at an acceptable level, justifying her termination/denial of promotion. [ECF No. 65 at 5–10]. In response, Plaintiff directs the Court to her performance evaluations prior to July 2018, where she

had been rated as "Fully Successful" in her job performance.  [ECF No. 93-2 ¶ 24(h)].  Although the Court recognizes that Plaintiff's 10-month evaluation and August 2018 out-of-cycle appraisal described Plaintiff as performing her job unsatisfactorily, [ECF Nos. 63-13 at 3, 63-17], her performance evaluations from January and May 2018 rated her as "Fully Successful or Higher" and "Fully Successful," respectively, in every performance element, [ECF Nos. 63–5 at 2, 63-7 at 3–8].  This, given Plaintiff's non-onerous burden at the prima facie stage, satisfies the second element.  See also Falero Santiago v. Stryker Corp., 10 F. Supp. 2d 93, 96 (D.P.R. 1998) (finding that the First Circuit considers positive feedback, even if not extending to the time of discharge, as satisfying the qualified element).

b.  Adverse Employment Action

As to the third prong, termination squarely constitutes an adverse employment action, as can a refusal to promote.  Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 158 (1st Cir. 2009); White v. N.H. Dep't of Corr., 221 F.3d 254, 262 (1st Cir. 2000) ("Adverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'") (citing Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)).

In the "failure-to-promote" context, Plaintiff must show that (1) she is a member of a protected class, (2) was qualified for the promoted position, (3) was not hired, and (4) that "an applicant with similar qualifications received the position."[16]  Henderson v. Mass. Bay Transp.

_____

[16] The Court observes that neither party briefed whether the refusal to promote Plaintiff qualifies as an adverse action in the instant case.  See generally [ECF Nos. 65, 93-2, 95].

Auth., 977 F.3d 20, 29 (1st Cir. 2020).  Here, because Plaintiff makes no showing that a similarly

qualified individual received a promotion, the Court finds that she cannot prevail on the

promotion claim.[17]

### c.   Causal Connection

Plaintiff must offer some evidence connecting her termination to her gender by, for

example, showing that her position "was filled by someone with similar qualifications" or

"remained open."  Bhatti, 659 F.3d at 70; Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st

Cir. 2001) (quoting Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir.

1999)).  Because it must draw all reasonable inferences in Plaintiff's favor, the Court concludes

that a reasonable jury could find a causal connection between her termination and gender.

Specifically, former employee Donna Murphy's declaration, describing that the DCAA had a

history of firing older female personnel, gives rise to a reasonable inference that Plaintiff was

terminated on account of her gender.  [ECF No. 63-8 at 2–3].  The record further shows that the

DCAA was actively recruiting and organized a hiring event for auditors, including at  Plaintiff's

GS-07 level, [ECF No. 93-3 at 11], suggesting that the agency had a "continued need for

'someone to perform the same work after [the complainant] left,'" Cumpiano v. Banco Santander

---

[17] To the extent Plaintiff asserts that she was denied her promotion because she was not assigned
a new coach, the Court notes that Plaintiff offers no evidence from which a reasonable jury could
conclude that her chances of a promotion were diminished as a result of the DCAA's actions.  de
Jesús v. Potter, 211 F. App'x 5, 10 (1st Cir. 2006); see Serna v. City of San Antonio, 244 F.3d
479, 484 (5th Cir. 2001).  To the contrary, the record indicates that Plaintiff received feedback
from Duquet on at least two occasions in July and August 2018, well after Plaintiff contends that
Duquet ceased to act as her coach in January 2018.  See [ECF No. 63-12; ECF No. 63-16; SOF
¶ 61].  Accordingly, the Court discredits any claims relating to an adverse employment action
resulting from an alleged failure to receive coaching.

P.R., 902 F.2d 148, 155 (1st Cir. 1990) (alteration in original) (quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 899 (1st Cir. 1988), aff'd, 759 F. Supp. 40 (D.P.R. 1991)); cf. Parra v. Four Seasons Hotel, 605 F. Supp. 2d 314, 327 (D. Mass. 2009) ("the mere fact that [Plaintiff] cannot show [she] was replaced by someone outside [her] protected classes does not defeat [her] prima facie case [for Title VII discrimination]").  Accordingly, the Court finds that Plaintiff has successfully established a prima facie case of gender discrimination.

ii.  Prima Facie Case: ADEA

In order to establish a prima facie case under the ADEA, Plaintiff must show that "(i) she was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the adverse action."  Del Valle-Santana v. Servicios Legales De P.R., Inc., 804 F.3d 127, 129–30 (1st Cir. 2015) (citing Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1st Cir. 1998)).

Given that, during the relevant period, Plaintiff was over the age of forty and the discussion supra, Plaintiff satisfies the first three elements.[18]  Murphy's declaration, suggesting that at least three individuals, including herself, over the age of fifty were "forced out" at around the same time period at issue in the instant action, [ECF No. 63-8 at 1–2], further add[s] 'color' to [the DCAA's] decisionmaking process," Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 249 (1st Cir. 1997).  At this juncture, where the Court must merely consider whether there is evidence indicating a "lack of neutrality," it is satisfied that Plaintiff met the fourth element and has therefore made a prima facie showing of age discrimination.  Brennan, 150 F.3d at 27–28.

---

[18] Plaintiff's date of birth is December 21, 1959, meaning she was approximately fifty-eight years old when the relevant alleged wrongful conduct occurred.  [ECF No. 93-3 at 2].

iii.  <u>Prima Facie Case: RA</u>

To establish a prima facie claim for discrimination under the Rehabilitation Act, Plaintiff must prove by a preponderance of the evidence: "(1) that [s]he suffered from a 'disability' within the meaning of the Act; (2) that [s]he was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) that, despite the employer's knowledge of h[er] disability, the [agency] did not offer a reasonable accommodation." <u>King</u>, 596 F. Supp. 3d at 219 (citing <u>Calero-Cerezo v. U.S. Dep't of Just.</u>, 355 F.3d 6, 20 (1st Cir. 2004)).  Generally speaking, to satisfy the first prong of the prima facie test—establishing that a plaintiff suffers from a protected disability—Plaintiff must show that she: (1) "suffers from an impairment"; (2) "the impairment affects a major life activity;" and (3) "that the impairment substantially limits the major life activity."  <u>Id.</u> at 220 (quoting <u>McDonough v. Donahoe</u>, 673 F.3d 41, 46 (1st Cir. 2012)).

Because Defendant does not appear to dispute that Plaintiff suffered from a disability within the meaning of the RA and does not address whether the DCAA in fact offered a reasonable accommodation, any arguments on those two elements are waived.[19]  <u>See generally</u> [ECF Nos. 65, 95]; <u>Grajales v. P.R. Ports Auth.</u>, 924 F. Supp. 2d 374, 383 (D.P.R. 2013) (because defendant only provided a few sentences on an element and failed to address another altogether, it waived any argument on them).  As to the second prong, as discussed <u>supra</u>, at this stage the Court is satisfied that Plaintiff has proffered sufficient evidence for a jury to conclude that she was qualified for her job without an accommodation.

---

[19] The undisputed facts indicate that Plaintiff was in the process of obtaining a reasonable accommodation but had not yet received such an accommodation when she was terminated.  <u>See</u> <u>supra</u>.

## 2. Defendant's Articulated Legitimate, Non-Discriminatory Reason

Because Plaintiff has made out a prima facie case for her Title VII, ADEA, and RA claims, "the burden of production — but not the burden of persuasion — shifts to [the employer], who must articulate a legitimate, non-discriminatory reason," Theidon v. Harvard Univ., 948 F.3d 477, 495 (1st Cir. 2020) (quoting Johnson v. Univ. of P.R., 714 F.3d 48, 53–54 (1st Cir. 2013)), and "produce credible [and admissible] evidence to show that the reason advanced [for taking the adverse employment action] was the real reason," Ríos-Jiménez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802).

Defendant primarily points to Plaintiff's unsatisfactory job performance and her difficulties in implementing guidance from her supervisor as a legitimate, non-discriminatory reason for ending her employment at the agency.  [ECF No. 65 at 6–14].

Here, the record suggests that Plaintiff did indeed have persistent difficulties performing her job.  In approximately April 2018, Parziale began raising concerns about Plaintiff's ability to implement guidance in a timely manner, [ECF No. 63-6 at 7], and seemingly included those concerns in Plaintiff's May 2018 performance evaluation.  [ECF No. 63-7 at 4 ("Brenda struggled with implementing supervisory guidance in a timely manner")].  Thereafter, in early June 2018, Parziale, together with Duquet, began having weekly meetings with Plaintiff to "discuss[] assignments and review[] areas that needed improvement."  [SOF ¶ 23].  The 10-month probationary/trial period evaluation performance report issued in July 2018, [ECF No. 63-13], as well as the August 2018 out-of-cycle appraisal, [ECF No. 63-17], flagged various areas, including "Audit Performance" and "Documenting and Reporting Results," as either "Unacceptable" or "less than fully successful," [ECF Nos. 63-13 at 2, 63-17 at 4–5].  Given the well documented job-performance issues, the Court concludes that "Defendant[] ha[s] met their

fairly light burden to establish a legitimate, non[-]discriminatory reason" for Plaintiff's

termination.  Sills v. Waddel & Reed, Inc., No. 08-cv-10314, 2009 WL 5943105, at *9 (D. Mass.

Feb. 25, 2009).

### 3. Pretext and Discriminatory Animus

Because "the employer's evidence creates a genuine issue of fact, the presumption of

discrimination drops from the case," Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st

Cir. 1998), and "the burden shifts back to [Plaintiff]," Zampierollo-Rheinfeldt v. Ingersoll-Rand

de P.R., Inc., 999 F.3d 37, 51 (1st Cir. 2021).  At this stage, to avoid summary judgment,

Plaintiff "must 'show by a preponderance of the evidence that [the employer's] proffered reason

is pretextual and that the actual reason for the adverse employment action is discriminatory.'"

Theidon, 948 F.3d at 496 (emphasis omitted) (quoting Johnson, 714 F.3d at 54).  In other words,

Plaintiff needs "some minimally sufficient evidence, direct or indirect, both of pretext and of

[Defendant's] discriminatory animus."  Id. at 497 (quoting Pearson v. Mass. Bay Transp. Auth.,

723 F.3d 36, 40 (1st Cir. 2013)).  Importantly, "pretext means more than an unusual act; it means

something worse than business error; pretext means deceit used to cover one's tracks."

Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008) (internal quotations

omitted) (quoting Ronda-Perez v. Banco Bilbao Vizcaya Argentaria–P.R., 404 F.3d 42, 45 (1st

Cir. 2005)).

In her Complaint, Plaintiff seems to suggest that several purported procedural and policy

irregularities indicate that her termination was pretextual.  Specifically, Plaintiff points to the (i)

"untimely served performance appraisals" in January and May 2018, purportedly in violation of

the Department of Defense Civilian Personnel Management System, [ECF No. 93-2 ¶¶ 3–4]; (ii)

refusal to grant Plaintiff's request for a transfer when "another younger, male newly hired

employee" had been granted such a request, [ECF No. 93-2 ¶ 24(b)]; (iii) change in her August

2018 probationary requirement status, [id. ¶ 24(f)]; (iv) refusal to assign a new coach in violation

of the DCAA Coaching Program, [id. 2 ¶ 24(a)], and; (v) the issuance of performance appraisals

contrary to DCAA regulations requiring a discussion with the evaluatee prior to the formal

written assessment, [id. ¶ 24(d)].  See generally [Compl. at 6–12].  As to her disability

discrimination claim, Plaintiff further contends that Parziale issued the first non-satisfactory

performance appraisals in July, after she had made Parziale aware of her disability.  [ECF No.

93-2 ¶ 5].

In view of the evidence presented by the parties, the Court cannot determine the extent to

which the DCAA's actions were contrary to the agency's internal procedure or policies.[20]  Even

so, Plaintiff has presented no evidence from which a reasonable jury could determine that any

administrative shortcomings served as pretext for terminating Plaintiff on the basis of her age,

gender, or disability.  Miceli v. JetBlue Airways Corp., 914 F.3d 73, 84 (1st Cir. 2019) ("[A]

bare showing of administrative error, without more, does not make out a case of either pretext or

discriminat[ion]"); Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 50–51 (1st Cir.

2019) (although "evidence that the employer deviated from its standard procedure or policies in

taking an adverse employment action against a plaintiff may be relevant to the pretext inquiry,"

plaintiff had pointed to no evidence that the policy at issue had "any bearing in the termination

---

[20] That said, on the issue of whether Plaintiff was incorrectly placed on a two-year probationary period, the Court observes that by Plaintiff's own admission, DCCA policy provides that new employees who transferred from another federal post are "normally" not required to complete a probationary period.  [ECF No. 63-26 at 4–5].  Plaintiff has presented no evidence to support her position that she was entitled to a waiver of the probationary period.  To the contrary, the record suggests that because her prior federal position was different in nature to the job of an auditor, human resources believed that her probationary requirement had been mistakenly waived.  See [ECF Nos. 93-3 at 12–13, 63-2 at 7].

decision or was even relevant to it.") (first citing <u>Acevedo-Parrilla</u>, 696 F.3d 128, at 142–43 (1st Cir. 2012), then <u>Brennan</u>, 150 F.3d at 29)); <u>see also</u> <u>id.</u> at 48–49 (concluding that "when faced with employment decisions that lack a clear discriminatory motive, '[c]ourts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions." (alteration in original) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 825 (1st Cir. 1991))).

Further, Murphy's declaration describing how older, primarily female, DCAA employees had been terminated and that she believed that there was a "pattern of age discrimination," [ECF No. 63-8 at 3–4], does not, without any other evidence, create a genuine dispute as to whether the agency's actions were pretextual to mask discriminatory animus, <u>see</u> <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 55–56 (1st Cir. 2000) (noting that "evidence of a company's general atmosphere of discrimination 'may be considered <u>along with any other evidence bearing on motive</u>'" (quoting <u>Sweeney v. Bd. of Trustees of Keene State Coll.</u>, 604 F.2d 106, 113 (1st Cir. 1979))) (Title VII case).

There is also no evidence from which a jury could discern that Parziale's negative performance reviews were triggered by Plaintiff's request for a reasonable accommodation in May 2018.  The undisputed facts show that Parziale began raising performance concerns as early as April—before Plaintiff had even told Parziale about her hearing impairment.  [ECF Nos. 63-6 at 7, 93-2 ¶ 1, 63-28 at 6, 95 at 6–7].  Moreover, the undisputed facts suggest that the agency was actively working on creating an appropriate work environment for Plaintiff.  On June 4, 2018, Cruz sent Plaintiff forms to submit her request and directed her to RA Manager Obey to

complete the process.[21]  [ECF No. 63-28 at 4–5].  Then, when she asked to move desks to avoid background noise, on August 28, 2018, Parziale promptly replied, saying that it was "no problem" for Plaintiff to switch desks.  [ECF Nos. 65 at 4, 63-27].  Cruz, when communicating with Plaintiff about a formal RA request, even told Plaintiff that she could request a "rate of speech," further suggesting that the DCAA was willing and even proactively trying to accommodate her hearing impairment.  [ECF No. 63-28 at 1].  Although Plaintiff, at least in part, attributes her communications issues with Parziale to her hearing impairment, see, e.g., [ECF No. 93-2 ¶ 13], she has proffered no evidence from which a jury could infer that her termination was pretextual on account of her disability.  Accordingly, Plaintiff has not met her burden of establishing that the agency's conduct was pretextual and motivated by discriminatory animus.[22]

### B.    Hostile Work Environment

Plaintiff further claims that Defendant subjected her to a hostile work environment because of her gender, age, and disability.  [Compl. at 6–9; ECF No. 93-2 ¶¶ 12, 24(i)–(j)].  "To

---

[21] The Court notes that there is no evidence that Plaintiff followed up with Obey prior to August 2018.

[22] To the extent Plaintiff seeks to infer discriminatory animus based the DCAA's decision to transfer "another younger, male newly hired employee" to a new supervisor/location, her attempt fails.  [ECF No. 93-2 ¶ 24(b)].  "A plaintiff in a disparate treatment case may attempt to show that 'others similarly situated to [her] in all relevant respects were treated differently by the employer.'"  Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003)) (Title VII case).  To determine whether comparators are similarly situated, courts "ask whether 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'"  Id. (quoting Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 64 (1st Cir. 2004)).  Here, the record offers no evidence which would allow the Court to conduct such an analysis.  Similarly, nothing in the record before the Court allows for a reasonable inference that Defendant's adjustment in Plaintiff's probationary status requirement was motivated by discriminatory intent.

establish a claim of 'hostile work environment . . .' a plaintiff must demonstrate 'that the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment.'" Lima v. City of E. Providence, 17 F.4th 202, 208 (1st Cir. 2021) (quoting Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 473 (1st Cir. 2010)); Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 91 (1st Cir. 2018) (In order to prove a hostile work environment claim, plaintiff must show that "the workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'" (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006)) (cleaned up)).  "In determining whether there is sufficient evidence for a jury to conclude that [Plaintiff] was subject to a hostile work environment," King, 596 F. Supp. 3d at 224, a court must consider "the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance,'" Rios v. Centerra Grp. LLC, 106 F.4th 101, 116 (1st Cir. 2024) (alteration in original) (quoting Brader v. Biogen Inc., 983 F.3d 39, 59 (1st Cir. 2020)).  Additionally, the "challenged conduct must be 'both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the plaintiff in fact did perceive it to be so.'" Brader, 983 F.3d at 59 (quoting Maldonado-Cátala v. Mun. of Naranjito, 876 F.3d 1, 10 (1st Cir. 2017)).

In the Court's liberal construction of the Complaint, Plaintiff points to several instances constituting harassment: (i) issuance of untimely served performance appraisals which did not allow for employee feedback contrary to DCAA policy; (ii) the "unsatisfactory" performance evaluations of July and August 2018; (iii) Parziale's purported refusal to provide adequate

supervisory guidance to Plaintiff; (iv) Parziale's alleged reaction to Plaintiff's requested reasonable accommodation, specifically that she did not handle such requests; (v) DeCourcy's purported dismissive reaction when Plaintiff requested guidance about improving her communication with Parziale; (vi) denial of a transfer request; (vii) Parziale's refusal to assign Plaintiff a new coach; and (viii) the change in Plaintiff's probationary requirement status in August 2018.  [Compl. at 6–9; ECF No. 95 at 7].

   Although Plaintiff is clearly aggrieved by Defendant's conduct and perceives it as hostile, the Court, even when construing the facts in the light most favorable to Plaintiff, cannot find that she has offered evidence that would allow a reasonable jury to conclude that these events amounted to a severe or pervasive "hostile work environment in the aggregate."  Bhatti, 659 F.3d at 74.  Although Plaintiff may not have appreciated Parziale's management style, "a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws."  Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 46–47 (1st Cir. 2003).  Neither, when looking at the totality of the circumstances, does Plaintiff provide "evidence as to how, exactly, any of [Parziale's] behavior actually constituted harassment in that it impacted [her] working conditions in such a way that could be reasonably viewed by a jury as being carried out in a severe or pervasive fashion."  Brader, 983 F.3d at 62.  Similarly, the evidence does not permit the inference that DeCourcy's supposedly flippant reaction, which Plaintiff has not described in any discernable detail, see generally [Compl.; ECF No. 93-1], was so offensive as to constitute a hostile work environment. See, e.g., Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 44 (1st Cir. 2011) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive

work environment." (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (cleaned up))).  As the First Circuit has remarked, "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins."  <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 19 (1st Cir. 2002) (alteration in original) (quoting <u>Suarez v. Pueblo Int'l, Inc.</u>, 229 F.3d 49, 54 (1st Cir. 2000)).

Plaintiff, moreover, has fallen far short of "connecting [] the complained-of conduct to any discriminatory animus," related to age, gender, or disability.  <u>Rios</u>, 106 F.4th at 116; <u>Brader</u>, 983 F.3d at 63 (observing that plaintiff had "fallen short" of proving a hostile work environment because he failed to show that the purported improper conduct "stem[med] from an impermissible motivation" (quoting <u>Maldonado</u>, 876 F.3d at 10)); <u>Rivera-Rivera</u>, 898 F.3d at 94 (affirming district court's grant of summary judgment in employer's favor on gender-based hostile work environment claim where plaintiff had been subjected to "constant yelling and screaming" because no nexus between employer's conduct and plaintiff's gender was found); <u>cf.</u> <u>Rios</u>, 106 F.4th at 117 (plaintiff's evidence that she was "taunted about her age nearly <u>every single day</u> for over two years" was sufficient to carry the day in an age-based hostile work environment claim (emphasis added)).  In sum, Plaintiff's hostile work environment claim is dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment, [ECF No. 64], is <u>GRANTED</u>.

**SO ORDERED.**

November 7, 2024                                        <u>/s/ Allison D. Burroughs</u>
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE